UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

JENNIFER LEE SMITH,                )
                                   )
        Plaintiff,                 )        Civil Action No. 5: 19-061-DCR
                                   )
V.                                 )
                                   )
HARTFORD LIFE AND ACCIDENT         )        **MEMORANDUM OPINION**
INSURANCE COMPANY,                 )            **AND ORDER**
                                   )
        Defendant.                 )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Jennifer Smith ("Smith" or "the plaintiff") and Defendant Hartford Life and Accident Insurance Company ("Hartford") have filed motions for judgment in this action brought under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* [Record Nos. 47 and 48] For the reasons outlined below, the Court will grant the defendant's motion and deny the relief sought by Smith. As a result, Hartford's administrative decision denying the plaintiff's long-term disability ("LTD") benefits claim will be affirmed.

## I. Relevant Factual and Procedural Background

Smith was employed as a branch manager of Countrywide Financial Corporation ("Countrywide") prior to January 31, 2001. [Record No. 18-1, p. 845] On that date, she resigned her position due to, *inter alia*, degenerative disc disease and fibromyalgia. [*Id.*]

While working at Countrywide, Smith enrolled in a Group Long Term Disability Policy ("the Plan"), a disability benefits plan governed by ERISA and issued by Continental Casualty Company ("Continental"). [Record No. 18, p. 32] The Plan has several provisions relevant to

the pending motions.   First, the Plan administrator maintains discretionary authority to

determine eligibility and entitlement to long term disability benefits.   [*Id.* at p. 48]   Second,

the Plan contains the following definition for "disability" as the term relates to LTD benefits

claims continually payable for more than 24 months:

> "Disability" means that Injury or Sickness causes physical or mental impairment
> to such a degree of severity that You are:
> 1. continuously unable to engage in any occupation for which You are or
> become qualified by education, training or experience; and
> 2. not working for wages in any occupation for which You are or become
> qualified by education, training or experience.

[*Id.* at p. 37]   Third, the Plan places the burden of proving a disability on the claimant, requiring

that the claimant submit evidence, at his or her expense, of the cause and prognosis of

disabilities and objective medical findings supporting his or her claims.   [*Id.* at p. 44]   The Plan

also states that claimants "may be asked to submit proof that [he or she] continue to be Disabled

and are continuing to receive *Appropriate and Regular Care of a Doctor*."   [*Id.*]   Lastly, the

Plan provides that monthly LTD benefits payments shall be reduced by certain "deductible

sources of income," including social security benefits.   [*Id.* at p. 39]   It also states that claimants

must "supply proof that [he or she has] applied for [] Deductible Income Benefits such as

Workers' Compensation or Social Security Disability benefits, when applicable."   [*Id.* at p.

44]

Smith initially filed a claim for benefits under the Plan on February 2, 2001.   [Record

No. 18, p. 156]   Continental denied the claim, and Smith sued, eventually obtaining a favorable

disposition in *Smith v. Cont'l Cas. Co.*, 450 F.3d 253 (6th Cir. 2006).   In October 2002, the

Social Security Administration ("SSA") awarded Smith Social Security Disability Insurance

("SSDI") benefits.   [*Id.* at p. 285]

Hartford had replaced Continental as the administrator and underwriter by the time the claim under the Plan was remanded for further administrative proceedings.  In June 2007, Hartford approved the 2001 claim and authorized retroactive and prospective LTD benefits payments.  [*Id.* at pp. 2-3]  Smith continued to maintain her LTD claim for the majority of the following decade with no interruption, and Hartford periodically reviewed the claim.  During these years, Hartford solicited input from Smith's doctors for documents relating to proof of disability  [*e.g.*, Record Nos. 18, pp. 196, 206, 242, 248, 295 and 18-1, pp. 9, 89, 90, and 97].

Hartford wrote to Smith on December 1, 2016, requesting updated documents concerning proof of disability, including an Attending Physician Statement ("APS").  [Record No. 18, p. 220]  Hartford followed-up on this request on December 22, 2016, and January 12, 2017.  [*Id.* at pp. 222-225]  Neither Smith, nor her primary care physician Dr. R. Ritchie Van Bussum, submitted the requested documentation, and Smith's claim was terminated on February 7, 2017, due to a failure to submit proof of disability as required by the plan.  [*Id.* at p. 226]  However, after receiving a February 20, 2017, APS from Van Bussum, Hartford reinstated the LTD benefits claim on March 1, 2017.  [*Id.* at p. 232]  In January 2018, Hartford sent letters and follow-up correspondences to Van Bussum and Pain Treatment Center of the Bluegrass ("PTCB") pain management physician Dr. Lauren Larson regarding Smith's capacity to work.  [Record No. 18, pp. 268-74]

After, again reviewing evidence concerning disability and work capacity, Hartford denied Smith's LTD claim on April 6, 2018.  [*Id.* at pp. 284-90]  The administrator's April 2018 denial letter ("the initial denial letter") indicates that Hartford took a holistic approach to determining the plaintiff's failure to meet the "disability" definition of the Plan but explicitly cited several pieces of evidence.

The administrator's letter discusses a November 9, 2016, consultation with Dr. Toufic Fakhoury at Saint Joseph Hospital to address Smith's complaints of weekly seizures or "spells."  [Record Nos. 18, p. 286 and 18-1, p. 373]  Fakhoury indicated that Smith's musculoskeletal range of motion, gait, coordination, and reflexes were normal.  [Record No. 18-1, pp. 13-14]  A MRI of the brain was normal, but Fakhoury noted that an EEG study showed mild bitemporal slow wave activity.  [*Id.* at p. 14]  He recommended a more thorough overnight EEG, but Smith stated that she needed to consult her husband to make arrangements.  [*Id.*]  The record indicates that Smith did not return to Fakhoury to further discuss or pursue treatment options.  [Record No. 18-2, p. 934]

The initial denial letter cites Van Bussum's February 17, 2017 APS.  [Record No. 18, p. 286]   Van Bussum's reported that Smith suffered from degenerative disc disease, fibromyalgia, migraines, sleep apnea, hypothyroidism, neck and back pain, limited mobility, insomnia, and fatigue while noting that she had a limited range of motion in the cervical and lower spine areas.  [Record No. 18-2, p. 493]  The physician indicated that Smith could sit for an hour at a time for three hours every day, drive for up to 2.5 hours, grip/grasp/handle for up to 2.5 hours, and reach for up to 2.5 hours.  [*Id.* at p. 492]  Van Bussum stated that Smith's status was stable but "highly unlikely ever to improve" and that she was incapable of returning to work.  [*Id.*]  The letter also cites to an August 3, 2017 visit to Van Bussum, which primarily concerned a Fioricet prescription for the plaintiff's reported migraines.  [Record Nos. 18, p. 286 and 18-1, pp. 16-17]

The initial denial letter documents a review of Smith's records from PTCB.  [Record No. 18, p. 286]  Although it is clear that Smith had numerous visits to this office, the letter focuses on the most recent consultations and procedures.  Larson reported on September 21,

2017, that Smith desired to decrease her "extremely high" doses of opioid pain medications. [Record No. 18-1, p. 24]  She accordingly developed a plan to taper Smith's dosages.  [*Id.* at p. 25]  The doctor also documented Smith's lower back pain that radiated down her left leg and noted that the pain was aggravated when the plaintiff sat for more than an hour or stood for more than 20 minutes.  [*Id.*]  On October 11, 2017, Larson diagnosed lumbar radiculitis and lumbar degenerative disc disease before performing a lumbosacral epidural steroid injection.  [*Id.* at p. 22]

Hartford also discussed periodic surveillance of Smith in 2017.  [Record No. 18, pp. 286-87] The letter emphasizes surveillance conducted on September 8, 2017.  On that date, Smith left her house in her car at 6:52 a.m.  [Record No. 18-2, p. 279]  She arrived at another residence, entered the house, and was seen leaving with a bag and two cupcake containers, which she put in her trunk.  [*Id.*]  She re-entered the residence and left with two other bags and a purse.  [*Id.*]  She opened the passenger rear-side door for a child who left with her.  [*Id.* at p. 280]  Thereafter, Smith continued to run errands.  At 8:11 a.m., she was observed entering a grocery store.  [*Id.*]  The investigator observed her pushing a shopping cart in the store and reaching for items that she then placed in the cart.  [*Id.*]  She left the store carrying bags, which she placed in her car.  [*Id.*]  Smith then proceeded to another grocery store at 8:29 a.m., and she left carrying several bags and a cake at 8:52 a.m.  [*Id.* at p. 281]   The investigator noted that Smith bent over to place the items into her trunk.  [*Id.*]  Smith returned to her residence at 8:57 a.m.  [*Id.*]

The administrator's initial denial letter also documents an in-person interview with its representative at the office of Smith's attorney on November 2, 2017.  [Record No. 18, p. 287]  During the interview, Smith stated that degenerative disc disease, fibromyalgia, chronic

- 5 -

migraines, a sleep disorder, and 100% hearing loss in her left ear prevented her from working. [Record No. 18-2, p. 813]  She also reported numerous movement limitations, including that: she could walk (sometimes with a limp) for a maximum of 20 minutes; she could stand in place for 10 minutes without support; she could sit for around 30 minutes without needing to stand up; and she could not bend at the waist.  [*Id.* at pp. 818-21, 824]  Smith further indicated that she could not run multiple errands in a single outing and that on the rare occasions that she went to a store to pick-up a lightweight item, she always needed assistance from a store clerk or her husband to take the item to and from her vehicle.  [*Id.* at p. 818]  The plaintiff noted that she could drive for a maximum of 1.5 hours at a time.  [*Id.* at p. 824]

Although the initial denial letter did not focus on such other activities, Smith also stated in this interview that she regularly takes her granddaughters to and from school and that she accompanied them to a public swimming pool during the summer.  [*Id.* at pp. 828-30] Smith further noted that she had taken her granddaughters on a trip to Gatlinburg, Tennessee in 2017 without her husband, making frequent stops along the way.  [*Id.* at pp. 832-33]

The letter places significant weight on the independent medical examination ("IME") of Dr. D. Paul Harries, a board-certified physician in physical medicine and rehabilitation, conducted at the administrator's request through a third-party vendor on February 2, 2018. [Record Nos. 18, pp. 287-88 and 18-1, pp. 71-78] Harries reported an examination of 586 pages of Smith's medical records, including Larson's September 21, 2017, consultation that resulted in lower dosages of opioid medications and documents concerning herniated discs. [Record No. 18-1, pp. 71-72] He also stated that he observed the 2017 surveillance footage, finding "normal gait, fluid movements, no evidence of distress, and no obvious evidence of functional limitation."  [*Id.* at p. 72] The doctor noted Smith's complaints of consistent lower

back pain, occasional neck pain, improving fibromyalgia symptoms that occurred less frequently than they had in the past, migraines occurring 5-10 times per month, and sleep problems. [*Id.* at pp. 72-73] Harries also indicated that Smith suffered from mild depression. [*Id.* at p. 73]

Harries performed a physical examination, finding: "[m]uscle bulk, tone, and power normal in all four limbs;" "[g]ait and station normal gait;" "[n]eck normal range of cervical spine motion, no facet tenderness;" pain-free movement of upper extremities; normal, pain-free lower extremities with a full hip range of motion; "[l]umbar spine flexion and extension limited by pain;" and three tender points concerning the plaintiff's fibromyalgia. [*Id.* at pp. 74-75]

Harries stated that Smith could: stoop, kneel/crawl, reach overhead, lift/carry up to 20 pounds, and push/pull up to 20 pounds occasionally. [*Id.* at pp. 76-77] He found that she could walk for up to an hour before a break for a total of six hours per day, stand for up to an hour before a break for a total of six hours per day, and sit for up to two hours before a break for a total of 8 hours per day. [*Id.* at p. 77] When addressing additional limitations concerning Smith's capacity to work 40 hours per week, he noted:

> [w]hile I could find no physical basis for restrictions in the examination or during my observations, I do believe that some restrictions are appropriate. The basis for these restrictions is her long-term reduced activity secondary to opioid use with resultant discontinuing and the potential for falls as the result of multiple medications. Sleep disorders can certainly cause muscle fatigue and high-dose opioid therapy is a common cause of somnolence. Fortunately, her opioid dosage is being reduced. It is noteworthy that in January 2017 she stated that she was completely independent with all activities of daily living. I could find no physical evidence today to support any inabilities with activities of daily living. The video surveillance in my opinion supports my overall impression.

[*Id.*]  Harries also stated his belief that Smith's perception of her limitations to be "far higher than the physical evidence would suggest," perhaps due to her opioid use, sleep disorder, and depression.  [*Id.* at pp. 77-78]

Hartford solicited input regarding Harries' IME report from Van Bussum and Larson on March 14, 2018, but no responses were received prior to the April termination of benefits. [*Id.* at pp. 278-81] The initial denial letter concluded that Harries' IME findings regarding functionality were consistent with United States Department of Labor's Dictionary of Occupational Titles' definitions of sedentary or light work.  [Record No. 18, p. 288]

Hartford's initial denial letter also documents that the administrator considered other vocational analyses.  The administrator conducted an Employability Analysis Report ("EAR") using the Occupational Access System ("OASYS"), a computer database that identifies potential occupations based on the 1991 version of the Dictionary of Occupational Titles. [Record No. 18-2, pp. 777-79] Hartford adjusted the EAR OASYS search for Smith's prior job as the manager of a financial institution, the time she had not worked due to disability, her pre-disability wages, and her current functional abilities.  [*Id.*]  The computer database identified no specific occupations that Smith could perform and noted that "employability is limited."  [*Id.* at p. 779] The same Hartford representative who performed the EAR remarked in a separate report that "[i]t should be noted that the physical demands of the employee[']s own occupation at time of disability fall within the outlined work functionality." [Record No. 18, p. 334] A different Hartford rehabilitation case manager conducted an evaluation and determined that because Smith was able to perform sedentary or light work, she could return to her occupation as branch manager.  [Record No. 18, p. 327]

Based on the restrictions documented by Harries as well as the administrator's EAR, Hartford concluded that Smith could perform her former job as a branch manager and no longer met the Plan's definition of disabled.  [Record No. 18, p. 288]  The denial letter also accounts for Smith's SSDI benefits claim that had been paid since 2002 but noted that its decision was not dependent on the SSA's decision to pay benefits because the SSA does not monitor disabilities as frequently as Hartford to assess disability as defined under the Plan.  [*Id.* at p. 285]

Smith appealed the denial of her claim.  In this appeal, Smith provided May 2, 2018 and September 12, 2018 letters from Van Bussum, which indicated that his "personal observation of the patient is that she has not changed physically to any extent that would allow her to return to work."  [Record No. 18-1, pp. 83, 447]  Further, Van Bussum's May 2 letter remarked, that "I have referred her to multiple specialists in the field of orthopedics, neurosurgery, neurology, rheumatology and pain management.  None of these specialists have been able to improve her health status to the point that she could return to work."  [Record No. 18-1, p. 83]

In conducting the appeal, Hartford again reviewed the entire medical record.  [Record No. 18, pp. 299-300]  The administrator also obtained a report through a third-party vendor from Dr. Matthew Chan, a board-certified physician in occupational medicine, who offered a separate analysis of Smith's medical records but did not conduct a physical examination.  [Record No. 18, pp. 300-302; Record No. 18-1, pp. 435-39]  Chan determined that Smith's degenerative disc disease, fibromyalgia, hypothyroidism, sleep apnea and migraines were "not impairing, as these are medically manageable conditions."  [Record No. 18-1, pp. 437-38]  Chan took issue with the remarks from Van Bussum's letter that "evaluation by other

specialists such as neurosurgery, neurology, rheumatology and pain management had no effect on the claimant's symptoms." [*Id.* at p. 438]  Instead, he stated that "there is no documentation from those specialists, as well as no recent radiology findings[,] which would support failed treatment plans suggested by above specialists." [*Id.*]  Chan found that there was a "lack of recent objective information [and] no documentation of a loss of use of an extremity, motor/sensory function loss, gait/mobility issues to preclude functioning." [*Id.*]  Dr. Chan concluded that Smith could perform light and possibly medium level work without significant restrictions or limitations. [*Id.*]

Chan solicited feedback from Van Bussum prior to Hartford's ultimate appellate decision. [*Id.* at p. 437] Van Bussum responded with an October 24, 2018 letter to Chan, enclosing a record from a May 2, 2018, appointment. [*Id.* at pp. 440-445]  He stated that he is a family practitioner (rather than a disability medicine specialist), but indicated that based on his personal knowledge, Smith's condition had not changed since she was initially declared disabled. [*Id.* at p. 440] The May 2 appointment record lists complaints of back pain, myalgias, and neck pain. [*Id.* at p. 441]  Smith reported no gait, fatigue, or sleep disturbance problems, although the doctor noted that she had been diagnosed with insomnia. [*Id.* at pp. 441-442] Additionally, Van Bussum's physical examination of the plaintiff indicated tenderness and decreased range of motion in the neck and lumbar areas as well as lower back pain. [*Id.* at p. 442] Van Bussum again documented Smith's migraines. [*Id.*]

After receiving Van Bussum's letter and the enclosed May 2018 record, Chan issued a revised report on November 2, 2018. [*Id.* at pp. 449-454]  Much of the report remained unchanged, but the doctor included more detailed opinions regarding Smith's functional capacity:

Given the claimant's overall age and general condition, as well as her partial response to administered treatment, she is able to perform safely at this level:

> Standing – frequently up to 20 minutes at a time for a total of 4 hours per day
> Walking – frequently up to 30 minutes at a time for a total of 4 hour per day
> Lifting (please specify the amount of weight) – occasionally up to 20 lbs.
> Carrying (please specify the amount of weight) – occasionally up to 20 lbs.
> Pushing (please specify the amount of weight) – occasionally up to 40 lbs.
> Pulling (please specify the amount of weight) – occasionally up to 20 lbs.
> Climbing stairs – occasionally
> Climbing ladders - never
> Stooping – occasionally
> Kneeling – occasionally
> Crouching – never
> Crawling – never
> Sitting – frequently up to 30 minutes at a time for a total of 6 hours per day
> Reaching – frequently
> Use lower extremities for foot controls – frequently
> Fine manipulation — frequently
> Simple and firm grasping – frequently

[*Id.* at pp. 451-52]

Hartford then issued an addendum to the initial EAR, incorporating Dr. Chan's findings. [Record No. 18-2, pp. 786-88] In addition to an OASYS evaluation similar to that of the initial EAR, the report contained additional research obtained through a separate database, the Occupational Information Network ("O*NET"),[1] for the position of "Financial

---

[1]     O*NET is an online database of occupational information that is sponsored by the Department of Labor and "is continually updated based on data collection efforts that began in 2001." *Cunnigham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010).

Managers, Branch or Department." [2]   [*Id.* at p. 788]   This database indicated that such an occupation requires sitting for more than half the time, standing or walking for less than half the time, and using hands to handle or make repetitive motions about half the time.   [*Id.*]   The case manager who conducted both EAR evaluations concluded that these physical demands of Smith's prior occupation aligned with her current work functionality.   [*Id.*]

Hartford denied the appeal on December 4, 2018, citing Chan's review as well as the addendum to the EAR as grounds for doing so.   [Record No. 18, pp. 299-303]   The appellate denial letter also states that administrator reviewed all documents in the claim file, including the Harries IME, surveillance information, and the initial EAR.   [*Id.* at p. 299]   This letter again notes that the Hartford's determination could diverge from that of the SSA regarding Smith's SSDI claim, as a claim for LTD benefits hinges on whether the claimant is disabled as defined by the Plan and evidence available to the SSA could differ from that in the administrator's possession.   [*Id.* at p. 302]   The appellate denial letter indicates that Hartford considered the SSA's SSDI determination as a non-dispositive "piece of relevant evidence" pertaining to Smith's LTD claim.   [*Id.*]

---

[2]      The OASYS findings in the addendum indicate that no occupations fell within the "closest" or "good" levels correlating to Smith's vocational abilities, 22 occupations within the "fair" level, and 7 occupations within the "potential" level.   [Record No. 18-1, p. 788]   However, the addendum also states that "The OASYS search taken to the fair and potential level resulted in no occupations being identified in the OASYS search."   [*Id.*]   Hartford explains that the second result with no alternative occupational matches reflects an evaluation with the same search parameters as that of the first EAR, while the first result reflects available occupations without the adjustments for Smith's prior wage-rate and decreased vocational capabilities due to nearly 20 years of unemployment.   [Record No. 52, p. 20 n. 5]   Regardless, the overarching conclusion of the addendum is that the O*NET results indicate that the plaintiff can perform her prior occupation given the medical evidence of her present limitations.

Smith filed the present action on February 21, 2019. [Record No. 1] She asserts that she is disabled under the terms of the Plan and that she is entitled to LTD benefits. [*Id.* at p. 7]

## II. The Standard of Review and Burden of Proof

An arbitrary and capricious standard of review governs the analysis of whether Hartford justifiably denied the LTD benefits claim. [See Record No. 38.] Under this standard, "[t]he plan administrator's decision should be upheld if it is 'the result of a deliberate, principled reasoning process' and 'supported by substantial evidence.'" *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009) (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shaw v. AT&T Umbrella Benefits Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks omitted)).

However, arbitrary and capricious review is not a rubber stamp in favor of a plan administrator. *Id.* Instead, the Court looks to several lodestars when analyzing the actions of an administrator, including: "the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Id.* (quoting *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013)) (internal quotation marks omitted).

While the parties agree on the arbitrary and capricious standard of review, the circumstances of the LTD benefits claim at issue in this case have resulted in a significant disagreement concerning the proof required to terminate benefits and uphold Hartford's decision. With the exception of a brief period in 2017, Hartford paid the claim for over ten years prior to its April 2018 decision to deny the claim. During this time, the administrator found, at least implicitly, that Smith was disabled. Smith contends that authority from the Sixth Circuit "requires a showing of the claimant's improved condition absent an explanation for the discrepancy from earlier assessments." [Record No. 55, p. 3 (citing *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010); *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009)).] Hartford interprets this as an argument that the denial of a previously-awarded claim places the burden of proof on the defendant and insists that this is not correct under the relevant caselaw. [Record No. 52, pp. 2-4]

Hartford's position is persuasive. The Sixth Circuit has found that, "[t]o succeed in [a] claim for disability benefits under ERISA, [a p]laintiff must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700-01 (6th Cir. 2014). "This is true even if disability benefits have been previously awarded but terminated." *Young v. Hartford Life & Accident Ins. Co.*, No. 6:19-61-KKC, 2020 WL 996448, at *3 (E.D. Ky. March 2, 2020) (citing *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir. 1991)).

The *Morris* case cited by Smith actually rejected the idea that evidence of improved condition is necessary for an administrator to avoid a finding that its decision was arbitrary and capricious under similar circumstances. 399 F. App'x at 984. The court found that "the

- 14 -

ultimate question is whether the plan administrator had a rational basis for concluding that [the plaintiff] was not disabled at the time of the new decision." *Id. Morris* indicates that a lack of evidence supporting an improved condition is "at most . . . a circumstance to be weighed by a reviewing court, rather than *per se* proof of arbitrariness." *Id.* (citations omitted).

The Court further notes that the terms of the Plan itself weigh against requiring Hartford to offer evidence of improved condition. *Miller*, 925 F.2d at 985 (finding that the burden of proof did not shift to the defendant where a benefits plan required the plaintiff to "continue to supply on demand proof of continuing disability to the satisfaction of the insurance company."). The Plan requires Smith to provide proof, at her expense, regarding, *inter alia*, the cause and prognosis of her disability and objective medical findings supporting her disability. The Plan also unambiguously states that Smith "may be asked to submit proof that [she] continue[s] to be [d]isabled." [*Id.*] Under the terms of the Plan, Smith clearly carries the responsibility of proving her disability at all steps of the administrative process. Thus, the Court will undertake its analysis with the understanding that the defendant is not presently (and was not administratively) required to offer evidence of improved condition.

### III.  Analysis

### A.  The Administrative Record

The evidence in the record, medical and nonmedical, is generally sufficient to support Hartford's decision to terminate benefits under the Plan. Moreover, Hartford's consideration of the evidence suggests a deliberate and principled reasoning process. Several points lead to these conclusions. First, certain recent medical records support Hartford's finding that Smith was not disabled under the Plan at the time the claim was denied. It is clear that the plaintiff continued to have lower back and migraine problems throughout the period of time directly

preceding the termination of benefits. However, the decision by Larson to progressively decrease opioid pain management medications that were ostensibly related to the lower back problems indicates that the relevant pain had, to some extent, improved. The seriousness of the seizure issue is not entirely clear, but the fact that Smith did not return to Fakhoury after the initial November 2016 consultation suggests that it was not a problem that would render the plaintiff unable to work. Additionally, Harries documented that Smith herself indicated that fibromyalgia pains were less frequent than they had been in the past. Harries also noted: normal gait, muscle tone, bulk, and power; a normal neck range of motion; pain-free movement of upper extremities; and normal, pain-free lower extremities with a full hip range of motion. Harries provided an evaluation of Smith's functional capabilities based on his personal examination of the plaintiff as well as a review of her medical records. Chan likewise provided a viable evaluation of the plaintiff's capacity to work based on an extensive review of medical records. Both reviewing doctors issued reports that support the idea that Smith could work in her former capacity. Collectively, this evidence supports the determination that Smith was not disabled under the Plan, and Hartford's reliance on it does not appear to be arbitrary and capricious.

Second, the quality of the medical evidence weighs in Hartford's favor. Larson offers specialized documentation of Smith's lower back pain and problems, but as noted, the dosage reduction indicates that that the plaintiff's pain had improved in the months preceding the termination of benefits. And Smith does not contend that any pain management physician has explicitly indicated that her pain was sufficiently serious to prevent her from working.

In fact, Van Bussum is the only doctor who has directly stated that Smith is unable to work. But this physician has also admitted that he is a family care physician who does not

specialize in disability medicine.  Conversely, Harries and Chan offered opinions that were consistent with Hartford's conclusion that the plaintiff could perform, at least, sedentary or light work, and these doctors are board-certified in fields that pertain to disability determinations and work capacity.  Moreover, Harries performed a physical examination of the plaintiff before opining that there was "no physical basis for [work] restrictions . . . ." [Record No. 18-1, p. 77]  Therefore, the quality of the medical evidence supports the decision to terminate benefits.

But Smith contends that Chan's opinion should be discounted because the doctor failed to account for various records.  [Record No. 47-1, pp. 17-18]  Part of this argument focuses on the physician's remark that there are no recent records from neurosurgery, neurology, rheumatology, and pain management specialists that support Van Bussum's May 2018 belief that treatment plans of the plaintiff's conditions had failed.  Smith attempts to refute Chan's statement by arguing that the doctor had actually reviewed PTCB specialist records.  [*Id.* at p. 17]  However, this point is unconvincing.

The fact that Chan possessed and reviewed the pain management records does not demonstrate that they support Van Bussum's May 2018 statement that all treatment plans failed to reduce or alleviate any of the problems that purportedly prevented Smith from working.  Larson's PTCB report could reasonably indicate the opposite, as she tapered Smith's opioid dosages.  Further, Chan ostensibly considered the opinions of multiple specialists and found that recent medical evidence provided "no documentation of a loss of use of an extremity, motor/sensory function loss, [or] gait/mobility issues to preclude functioning." [Record No. 18-1, p. 452]  This appears to be a reasoned conclusion that is not contradicted

by specialist opinions in the period of time directly preceding the termination of the LTD claim.

The other portion of the records-based argument focuses on the fact that Chan reviewed a medical record significantly smaller than the 3,285-page administrative record before the Court. [*Id.* at pp. 17-18] Smith specifically claims that Chan did not review the record from her visit to Fakhoury. [*Id.* at p. 18] However, as Hartford notes, large parts of the record before the Court involve documents that the doctor would not have considered to form a medical opinion, including those concerning the Plan itself, Smith's work history, and Hartford's administrative handling of the LTD claim. [Record No. 52, pp. 15-16] And Chan explicitly noted that he reviewed a record from a visit to Saint Joseph Hospital, the location of Fakhoury's practice, dated November 9, 2016, the date of Smith's visit to Fakhoury. [Record No. 18-1, p. 449] Thus, the record-based argument fails.

Smith also contends that the decision to discount treating physicians' opinions was arbitrary. [Record No. 47-1, pp. 19-20] As the plaintiff correctly states, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). However, the Supreme Court of the United States held in *Black & Decker* that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*; *see also Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473-74 (6th Cir. 2005).

Here, reliable evidence cited in the initial denial letter supported the termination of benefits, and the decision to discount Van Bussum's opinions that the plaintiff could not return to work was not arbitrary. Such evidence includes, *inter alia*, Larson's decision to curtail opioid dosages, the plaintiff's own statements during an in-person interview with Hartford's representatives, and Harries' IME.

Further, the appellate denial letter ostensibly indicates that Hartford considered these same items of evidence on appeal. And the letter's emphasis on Chan's analysis was not arbitrary even though the administrator necessarily discounted Van Bussum's opinions by agreeing with the third-party physician. As noted, Chan's report cogently explains that Van Bussum's opinions did not accord with the medical evidence in this case. Based on his findings, Chan offered a reasonable opinion that Smith did not have functional limitations that prevented her from performing light or (potentially) medium level work. This conclusion about Smith's capacity to work was similar (albeit not identical) to that of Harries, an examining physician.

It is not entirely clear whether Smith argues that Hartford inappropriately discounted Larson's opinion. It is evident, however, that the plaintiff broadly objects to the administrator's decision to discount the opinions of multiple treating physicians (presumably including Larson) in favor of Chan's determination regarding Smith's ability to work. [Record No. 47-1, pp. 19-20] On this point, the Court notes that: (1) Chan's report suggests that Smith's condition was marginally worse than Larson believed because the reviewing doctor concluded that the plaintiff could not sit for more than *30 minutes* or stand for more than 20 minutes at a time, whereas the treating physician noted that sitting for more than *an hour* or standing for more than 20 minutes aggravated her pain; and (2) Chan offered the conclusion that such

limitations should not prevent Smith from performing light to medium level work, whereas Larson did not opine about the plaintiff's ability to work.  If anything, Chan's opinion is slightly more favorable to Smith than that of Larson and complements the treating physician's findings with a conclusion about Smith's capability to work.

Third, Hartford appropriately considered available vocational evidence.  The rehabilitation case manager stated that Smith's functionality satisfied the requirements of her prior occupation as branch manager prior to the issuance of the initial denial letter and in the addendum to the EAR.  Additionally, the record demonstrates that another case manager performed a similar evaluation and reached the same conclusion.  These determinations are consistent with Harries and Chan's reports as well as the O*NET results discussed in the addendum.[3]  [Record No. 52, pp. 18-19]

Smith argues that the O*NET results do not alter the conclusion that the administrator's reliance on the EAR addendum was arbitrary and capricious because the report is "void of any reference of suitable alternative occupations."  [Record No. 55, p. 5] But the O*NET results document the functional requirements of a branch manager, which as the addendum indicates, correspond with Smith's physical capabilities based on the medical evidence.  The addendum does not list alternative occupations because it concludes that Smith is able to perform her prior occupation.  Given the sufficiency of that medical evidence, the reliance on this finding is not misguided.

Smith also argues that reliance on the EAR and its addendum was arbitrary and capricious because the OASYS database search results listed in these documents did not

---

[3]     The Sixth Circuit has endorsed the use of O*NET in vocational analyses.  *Cunningham*, 360 F. App'x at 616.

identify specific jobs that she would be able to perform. [Record No. 47-1, pp. 21-22] Hartford responds that the OASYS evaluations included trait adjustments, such as decreased vocational ability due to time away from the workforce and pre-disability wages, that the administrator was not compelled to make under the Plan when considering potential jobs that Smith could potentially perform. [Record No. 52, pp. 19-20] The administrator emphasizes that the O*NET analysis of the addendum does not account for these unnecessary factors and indicates that Smith is able to perform the requirements of her prior occupation. [*Id.* at pp. 20-21]

The Court agrees that the OASYS search results are inconsequential. Plan administrators are generally not required to consult vocational evidence prior to finding that a claimant is not disabled where substantial medical evidence exists to support the decision. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 661-63 (6th Cir. 2013). And in this case, continued LTD payments under the Plan hinge on, *inter alia*, whether Smith can prove that she is "unable to engage in *any* occupation for which [she is] or become[s] qualified by education, training or experience . . . ." [Record No. 18, p. 37 (emphasis added).] The Plan does not require the administrator to identify specific occupations that Smith could perform prior to finding that she is not disabled – it merely places a burden on the plaintiff to prove that she cannot engage in *any* occupation for which she is qualified. *Cf. Leppert v. Liberty Life Assurance Co. of Boston*, No. 2:14-cv-1207, 2016 WL 1161957, at *5 (S.D. Ohio March 24, 2020).

And to the extent the Plan does contemplate Hartford's use of vocational tools to identify potential occupations, the relevant terms would allow Hartford to perform evaluations that do not account for pre-disability wage rates associated with her former job or the fact that Smith has been away from the workforce. The O*NET evaluation did just that, and it, along

- 21 -

with other vocational and functional analyses, indicates that Smith could perform the tasks required of a branch manager.  Thus, Hartford's citations to the documents that include the OASYS tests do not render its decision to terminate benefits arbitrary and capricious.

Fourth, other nonmedical and nonvocational evidence in the record indicates that the decision to deny the LTD claim was appropriate.  This is particularly true of the September 2017 surveillance, which is mentioned in both the initial denial letter and the appellate denial letter.  The investigator observed Smith leave her house at approximately 6:52 a.m. and return more than two hours later.  During this period, she drove her car to multiple locations, exiting and re-entering the car on three occasions.  She went to two separate grocery stores and was observed carrying multiple items from those stores to her car by herself without the aid of any third parties.  She opened the doors and trunk of her car and bent over on at least one occasion to place items in the trunk.  This episode contradicts Smith's interview statements that she is unable to run multiple errands in one trip, carry items to her car by herself, and bend at the waist.

Further, the Sixth Circuit has found that reliance on surveillance is not arbitrary and capricious when reviewing physicians conclude that the observed "performance of the tasks described contradict[] the symptoms [] reported to [] medical examiners."  *O'Bryan v. Consol Energy, Inc.*, 477 F. App'x 306, 309 (6th Cir. 2012).  Here, Harries explicitly stated that the surveillance footage comported with his findings that Smith had overexaggerated her limitations.  While the surveillance would not, by itself, justify a termination of the plaintiff's claim, it clearly supports the medical evidence in this case and the determination that evidence that the plaintiff was not disabled under the Plan.

- 22 -

Evidence from Smith's interview that is not explicitly cited in the initial or appellate denial letters also supports Hartford's view of the medical evidence in this case.[4]  Smith stated that she regularly drops off and picks up her granddaughters from school and has taken them to the pool.  She also indicated that she escorted them on a trip to Gatlinburg without her husband, which as Hartford indicates [Record No. 48-1, p. 11], would require a three to four-hour drive.  *See* Lexington, Kentucky to Gatlinburg, Tennessee, https://www.mapquest.com/directions/list/1/us/ky/lexington/to/us/tennessee/gatlinburg-tn-282026495 (last visited July 23, 2020).  Even with frequent stops, this would be a considerable journey for an individual who is unable to work a job that requires sitting for the majority of the workday.  Again, these pieces of evidence alone do not substantiate the administrator's decision in this case.  Nevertheless, they tend to support the functional conclusions of Harries and Chan as well as the general decision to find that the plaintiff was not disabled.

In summary, substantial evidence in the administrative record supports Hartford's decision to terminate LTD benefits, *i.e.* its determination that Smith was not disabled as of April 6, 2018.  Additionally, the administrator's handling of the evidence appears to be the result of a deliberate and principled reasoning process.

### B.  Conflict of Interest

Smith argues that Hartford's role as administrator and payor of the Plan creates an inherent conflict of interest that weighs in favor of finding that the administrator's decision to terminate benefits was arbitrary and capricious.  [Record No. 47-1, p. 11]  The plaintiff claims

---

[4]     Although Hartford did not expressly cite this evidence, it did refer to the interview in both letters.  And such interview statements are relevant to the present analysis because they are in the administrative record and further indicate that substantial evidence supported the administrator's ultimate decision to deny the LTD claim.

that Hartford has admitted to assessing the performance of its claim evaluators based on the "quality and accuracy" of their decisions and that this concession implies that they are rewarded for issuing decisions favorable to the administrator. [*Id.* at pp. 11-12]  Smith also contends that the defendant failed to comply with this Court's December 13, 2019 Order [Record No. 45] requiring the defendant to disclose monitoring and supervision policies concerning claim processing and bonus compensation. [*Id.*]

In response, Hartford broadly claims that the plaintiff has offered no evidence of bias motivating the decision to terminate Smith's LTD benefits while it has produced evidence to refute the plaintiff's argument and complied with the Court's Order. [Record No. 52, pp. 22-25]  The administrator cites an interrogatory response that states:

> Ability Analysts or Appeal Specialists with any incentive, bonus, or other special recognition or rewards based in whole or in part upon claims denial or terminations.  Hartford further states that its claims decision-makers are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or claims denied.

[Record No. 47-6, p. 3]

The defendant also cites to the sworn declaration of Adam Garcia, its Director of Group Insurance Claims, who stated that "Ability Analysts and Appeals Specialists are evaluated on the quality and accuracy of their claims decisions in accordance with the applicable plan/policy documents.  Hartford does not discourage its claim decision-makers from paying claims that are entitled to payment pursuant to the applicable plan provisions." [Record No. 37-4, p. 4] The administrator states that its supplemental discovery responses complied with the Court's prior Order addressing discovery because they narrowly indicated that no specific claim supervision and monitoring policy documents were consulted in Smith's case. [Record No. 52, p. 24 (citing Record Nos. 45 (Order) and 47-6 (supplemental discovery responses).]

Hartford also points to several facts unrelated to its discovery responses to bolster its position.  The administrator asserts that it "takes active steps to reduce potential bias and promote accuracy."  [Record No. 48-1, p. 26 (citing Record No. 37-4 (Declaration of Garcia).]  It specifically cites to its use of third-party vendors to contract and communicate with Harries and Chan.  [Record No. 48-1, p. 26]  Additionally, the defendant contends that the fact that Hartford paid the claim for over ten years prior to denying it weighs against a finding that a conflict of interest motivated the decision in this case.  [Record No. 52, p. 25 (citing *Morris v. Am. Elec. Power Long-Term Disability Plan*, No. 2:07-cv-183, 2008 WL 4449084 *1, *14 (S.D. Ohio Sept. 30, 2008)).]

A conflict of interest exists in the ERISA context if the defendant has a "dual function" of "both determining eligibility and paying benefits" under a plan.  *Okuno v. Reliance Std. Life Ins. Co.*, 836 F.3d 600, 609 (6th Cir. 2016) (citing *Glenn*, 461 F.3d at 666; *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998)).  However, as noted, a conflict of interest is merely one factor in determining whether the administrator's decision was arbitrary and capricious.  *E.g.*, *Shaw*, 795 F.3d at 547.  And a conflict of interest is not accorded significant weight if a claimant does not offer more than "conclusory allegations" or "general inferences" that an administrator's decision to deny a benefits claim was motivated by bias.  *Collins v. Unum Life Ins. Co. of America*, 682 F. App'x 381, 387 (6th Cir. 2017) (citations omitted).  Additionally, the existence of a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances . . . ."  *Glenn*, 554 U.S. at 117.

- 25 -

A conflict of interest exists in this case because Hartford is both the administrator and underwriter of the Plan, but Smith's arguments regarding the effect of the conflict are speculative. As Hartford asserts, she cites no evidence apart from the "quality and accuracy" language of the discovery response to support her contention that the conflict influenced the decision to deny her LTD claim. And evaluations based on the quality and accuracy of decisions do not necessarily support the inference that Hartford rewards employees for denying claims. For example, this language could just as easily imply that the administrator assesses decisions based on their thoroughness or general reasoning.

Conversely, Hartford has offered sworn statements that its claim evaluators are in no way compensated or recognized based on their propensity to deny claims and that such employees are not discouraged to pay benefits claims when it is warranted under the terms of a plan. Nothing in the record refutes these statements. Hartford also adhered to the Court's prior Order. The Order was clear that it only compelled the disclosure of information relating to policies and procedures that were "actually consulted" in Smith's case [Record No. 45, p. 6], and the discovery responses complied with this directive.

Other facts also support the conclusion that the conflict of interest did not influence the administrative denial of Smith's claim. For one, Hartford has procedural safeguards in place to avoid bias-based decisions. In this case, the administrator used third-party vendors to contract and communicate with Harries and Chan. It placed significant weight on the reports of these doctors, but there is no indication that it ever had direct conversations with them or improperly attempted to influence their professional opinions. Further, Garcia's declaration includes the statement that "Hartford's financial and underwriting departments do not advise or influence the claims department, or the appeals unit with respect to the denial or termination

- 26 -

of a claimant's benefits.  Indeed, these units are kept separate from each other." [Record No. 37-4, p. 4]  In *Glenn*, the Supreme Court specifically listed such a safeguard as a reason to doubt inappropriate conduct when a conflict of interest exists.  554 U.S. at 117.

Further, Hartford's earlier handling of the LTD claim does not suggest that its 2018 decision was motivated by bias.  It paid the LTD benefits claim for over ten years prior to denying it in 2018.  And although the administrator terminated Smith's benefits in 2017 because she failed to submit proof of disability as required by the Plan, it promptly reinstated her benefits when she submitted Van Bussum's February 2017 APS.[5]  Hartford appears to have treated Smith fairly throughout the decade preceding the April 2018 claim denial, and its earlier conduct does not support an inference that its later investigations and decision were influenced by an improper motive.

In short, Smith offers no more than conclusory allegations or general inferences in support of the argument that the conflict of interest in this case affected Hartford's decision to terminate her benefits.  Hartford complied with the December 2019 Order and has offered evidence that directly supports its position that an improper motive did not impact the administrative proceeding.  Further, Hartford's procedural safeguards and earlier conduct while administering Smith's claim counsel against placing significant weight on the impact of the conflict of interest in this case.  Thus, the Court finds that this factor of the Court's analysis weighs against a determination that Hartford's decision was arbitrary and capricious.

---

[5]     This decision to reinstate benefits on this occasion occurred prior to the existence of the majority of the evidence Hartford relied upon in its decision to deny the claim in April 2018.

## C. SSA Benefits

The plaintiff asserts that the SSA's continued payment of her SSDI claim weighs in favor of finding the defendant's decision to be arbitrary and capricious.  [Record No. 51, p. 15]  She contends that there is no evidence that Hartford considered the SSA's determination other than to offset its own financial liability under the Plan.  [Record No. 51, p. 15]  Hartford responds that the SSDI award does not definitively prove a disability under the Plan and that the initial and appellate denial letters addressed potential discrepancies between the SSA and LTD benefits claims.  [Record No. 56, p. 14]

As noted, an administrator's consideration of a SSA benefits determination is one factor bearing on whether the defendant's decision to deny a claim was arbitrary and capricious. *Shaw*, 795 F.3d at 547.  The Sixth Circuit has indicated that:

> if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn*, 461 F.3d at 669).  That said, the Sixth Circuit has also held that "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan."  *Whitaker v. Hartford Life and Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) (citations omitted).  This is so because "a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria."  *Id.*

In this case, the Plan lists social security benefits as a "deductible source of income," *i.e.*, a source of income that Hartford uses to offset LTD claim payments.  It also ostensibly required Smith to submit proof that she applied for relevant deductible sources of income.

- 28 -

The administrator accounted for potential discrepancies between the SSA's determination and its decision to terminate LTD benefits to some extent. The initial denial letter acknowledges that Smith had maintained a SSDI claim since 2002 and stated that Hartford, unlike the SSA, continually gathers medical information to specifically assess whether she has met her burden of proving disability under the Plan. The appellate denial letter reiterates this point while also noting that the criteria for finding disability in the social security context differ from those of the Plan. The subsequent letter also indicates Hartford did consider the SSA's determination as a piece of evidence pertaining to Smith's capacity.

Still, these are relatively generalized explanations that do not, in any detail, explain why the SSA's treatment of the SSDI claim differs from Hartford's decision in this case. There is an indication that the administrator may have possessed more recent medical records than the SSA, but there is no evidence or considerable discussion of this point. Further, Hartford did not allude to any related SSA proceeding after the award of SSDI benefits in 2002 despite the fact that the administrator necessarily monitored the social security claim to offset its own obligations under the Plan while it paid the LTD claim for over ten years. Thus, this factor weighs in favor of a finding that Hartford's decision was arbitrary and capricious.

### D. File Review and Physical Examination

Smith contends that the reliance upon Chan's report is misplaced because he conducted a file review of the plaintiff's medical records without performing a physical examination. [Record Nos. 47-1, p. 17 and 51, p. 16] The defendant argues that Harries performed a physical examination of the claimant, Chan's file review was consistent with the functional findings of Harries, and file reviews are not inherently improper. [Record No. 56, pp. 9-11]

Whether the administrator conducted a file review as opposed to a physical examination of the plaintiff is the fourth and final lodestar outlined in *Shaw*. 795 F.3d at 547. "A plan's decision to conduct a file-only review – 'especially where the right to [conduct a physical examination] is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.'" *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (quoting *Calvert*, 409 F.3d at 296 (6th Cir. 2005)) (alteration in original). This is particularly true where a file review offers conclusions based on "critical credibility determinations regarding a claimant's medical history and symptomology." *Calvert*, 409 F.3d, 286, 296 n. 6 (6th Cir. 2005). However, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Id.* And the Sixth Circuit has indicated that reliance on a file review is generally not misplaced where other substantial evidence supports an administrator's decision to deny benefits and that administrator has also retained a physician to physically examine the plaintiff. *Jackson v. Blue Cross Blue Shield of Michigan Long Term Disability Program*, 761 F. App'x 539, 546 (6th Cir. 2019).

Reliance on the file review was not improper in this matter. This is not a case where the administrator exclusively used a file review to justify its conclusion that the plaintiff failed to prove her disability. Harries performed a physical examination of the plaintiff, the administrator relied heavily upon his IME when making the initial determination to deny the LTD claim, and the IME was a part of the record reviewed during the administrative appeal. Moreover, Chan's file review findings are consistent with other medical evidence. His opinions generally comport with the ultimate work functionality determination of Harries, and he actually found that the plaintiff could sit, walk, and stand for less time than Harries opined.

And as noted, Chan's opinions are largely consistent with those of Larson, a treating physician. Although he necessarily discounted the opinions of Van Bussum and the complaints of the plaintiff, he explained his reasons for doing so and his determinations are supported by substantial evidence in the record. Therefore, the Court finds that Hartford's emphasis on the Chan file review does not favor a ruling that the administrator's decision was arbitrary and capricious.

## IV.  Conclusion

Three out of four lodestars weigh in favor of finding that the defendant's decision to terminate LTD benefits was not arbitrary and capricious.  The medical and nonmedical evidence in the record provides substantial support for the administrator's determination that Smith was not disabled as defined by the Plan.  Further, the administrator's handling of that evidence suggests that its decision was the result of a principled reasoning process.  There is a conflict of interest because Hartford serves as payor and administrator of the Plan, but nothing in the record indicates that any improper motive influenced its decision to deny the LTD claim. The fact that Chan conducted a file review does not support a conclusion that the administrator's review of the claim was arbitrary and capricious because it also contracted with a third-party physician to perform a physical examination and Chan's conclusions are largely consistent with other pieces of evidence in the record.

And while the mere conclusory allusions to differences between claims under the Plan and Smith's SSDI claim weigh in favor of the plaintiff's position, this factor is not dispositive. Because the other three factors, and the record in general, support the conclusion that Hartford's review of the LTD claim was not arbitrary and capricious, the Court will deny

Smith's pending motion, grant Hartford's motion for judgment, and uphold the administrator's decision.  Accordingly, it is hereby

**ORDERED** as follows:

1.      Plaintiff Jennifer Smith's motion for judgment [Record No. 47] is **DENIED**.

2.      Defendant Hartford Life and Accident Insurance Company's motion for judgment [Record No. 48] is **GRANTED**.

3.      Hartford's decision will be **AFFIRMED** by separate judgment entered this date.

Dated:  July 29, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky